**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY MARANO COMPANY, | |
| Plaintiff, | |
| v. | No. 08 C 4244 |
| | Judge James B. Zagel |
| MS-GRAND BRIDGEVIEW, INC., an Illinois corporation, d/b/a MELROSE FRESH MARKET, PETER LIMPERIS, and MAKIS LIMPERIS, | |
| Defendants. | |
| _____ | |
| JACK TUCHTEN WHOLESALE PRODUCE, INC., | |
| Intervening Plaintiff, | |
| v. | |
| MS-GRAND BRIDGEVIEW, INC., an Illinois corporation, d/b/a MELROSE FRESH MARKET, PETER LIMPERIS, and, MAKIS LIMPERIS | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

Plaintiff, Anthony Marano Company ("Marano"), and Intervening Plaintiffs, Jack

Tuchten Wholesale Produce, Inc. ("Tuchten"), Auster Acquisitions LLC a/t/a The Auster

Company ("Auster"), Inc., and Michael H. Navilio & Son, Inc. ("Navilio") (collectively,

"Tuchten Plaintiffs"), are suppliers of agricultural produce to Defendants, who owned and

operated MS-Grand Bridgeview, Inc. ("MS-Grand"), doing business as Melrose Fresh Market, a grocery store in Bridgeview, Illinois. Marano commenced this action on July 25, 2008 to enforce payment from the trust established by the provisions of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c) ("PACA"). The Tuchten Plaintiffs intervened also asserting trust claims against Melrose Market and its principals. The total amount of unpaid produce claims is about $1.3 million.

Marano moved for entry of a temporary restraining order to prevent dissipation of trust assets, which I granted on August 14, 2008. On September 19, 2008, I entered a preliminary injunction which ordered that all banking institutions holding funds belonging to MS-Grand turn them over to Tuchten's counsel for the benefit of Tuchten and all similarly situated creditors. Pursuant to the temporary injunction, $10,720.20 was turned over to Tuchten. Accordingly, the issue of secondary liability of MS-Grand's principals for the trust debt is of paramount concern to MS-Grand's creditors.

Three motions for summary judgment are pending before me. Plaintiff Marano moves for summary judgment against Defendants MS-Grand and Peter Limperis ("Limperis"). Intervening Plaintiffs Tuchten, Auster, and Navilio also move for summary judgment against Defendants MS-Grand, Limperis, and Efstravius Vitogiannis a/k/a Steven R. Vitogiannis ("Vitogiannis"). Vitogiannis has moved for summary judgment against the Tuchten Plaintiffs as to his personal liability. For the foregoing reasons, Marano, Tuchten, and Auster's summary judgment motions are granted. Navilio's motion for summary judgment as to MS-Grand and Limperis is granted, but denied as to Vitogiannis. Vitogiannis' motion for summary judgment is denied as to Tuchten and Auster, and granted as to Navilio.

## II. PRELIMINARY ISSUES

Vitogiannis has moved to strike the declarations of Thomas Bastounes ("Bastounes"), and Dawn E. Arkin ("Arkin") pursuant to Federal Rule of Civil Procedure 56.[1]  Pursuant to this rule, "a supporting [] affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. PRO. 56(e)(1).   "An affidavit that does not measure up to the standards of F.R.Civ.P. 56(e) is subject to a motion to strike."  *In re Associated Bicycle Service, Inc.*, 128 B.R. 436, 441 (Bankr. N.D. Ind. 1990).  Specifically, Vitogiannis moved to strike paragraphs 6 and 14 from the Declaration of Bastounes, and paragraphs 6 and 12 from the Declaration of Arkin on grounds that they do not have any personal knowledge regarding their assertions.

Intervening Plaintiffs oppose Vitogiannis' motion to strike on two grounds.  First, they argue that personal knowledge can be based on reasonable inference.  Next, they contend that Vitogiannis' signing of MS-Grand checks is evidence of control of PACA trust assets.  Personal knowledge can be based on reasonable inference.  As recognized by the Seventh Circuit, all perception is inferential to some degree.  *Agfa-Gevaert, AG. v. A.B. Dick Co.*, 879 F.2d 1518, 1522 (7 th Cir. 1989).  Knowledge acquired from others may still be personal knowledge rather than hearsay, and likewise, inferences that business executives customarily draw can constitute personal knowledge.  *Id*.

In his motion, Vitogiannis takes issue with three propositions contained in each respective affidavit: (1) Vitogiannis' position or activities at MS-Grand; (2) whether Vitogiannis

---

[1] Vitogiannis also moved to strike the affidavit of James Navilio, however Navilio has withdrawn its opposition to Vitogiannis' cross-motion for summary judgment, and therefore Vitogiannis' motion to strike the Declaration of Navilio has been rendered moot.

was in a position of control over Intervening Plaintiffs' PACA trust assets; and (3) whether Vitogiannis is liable to Intervening Plaintiffs in any amount. Specifically, Vitogiannis argues that because the Declarants did not state in their declaration that they personally witnessed or observed the daily activities of MS-Grand and its employees, officers, directors, and shareholders, they have no personal knowledge of Vitogiannis' being an owner or employee at MS-Grand, or signatory on its accounts, whether Vitogiannis was in a position of control over PACA trust assets, or whether he is liable to Intervening Plaintiffs for any amounts.

In response to Vitogiannis' motion to strike, Intervening Plaintiffs submitted supplemental declarations regarding the Declarations of Arkin and Bastounes. Arkin's supplemental declarations state that she reviewed checks to Tuchten from MS-Grand that "appear to bear the signature of someone whose first name begins with "S" and last name begins with "V."" After the commencement of this suit, Arkin learned that Vitogiannis was a signatory on MS-Grand's accounts, a one-third owner of MS-Grand, and an employee of MS-Grand. Arkin admits that she "never went to the MS-Grand store premises or personally viewed Steven Vitogiannis' activities," however, Arkin states that she has "personal knowledge" that Vitogiannis was in control of PACA trust assets. The supplemental declaration of Bastounes contains identical statements to those put forth in Arkin's supplemental declaration described *supra*.

Vitogiannis complains that declarants have no personal knowledge of his status as an owner, employee, and bank account signatory. Their assertions, however, are reasonable inferences that business executives customarily draw that constitute personal knowledge. Furthermore, Vitogiannis has not explained what prejudice he suffers from the admission of

these declarations when these facts are undisputed and supported by other evidence. Accordingly, I deny Vitogiannis' motion to strike the portions of the Declarations relating to Vitogiannis' role as owner, manager, and bank account signatory with MS-Grand.

The declarations of Bastounes and Arkin next opine that Vitogiannis was in a position of control over the trust assets. Vitogiannis argues that such statements must be stricken because they never personally visited Melrose Fresh Market nor did they observe Vitogiannis' activities. Furthermore, Defendant notes, the Declarants' opinions are based on knowledge they obtained after the lawsuit began for which there is no foundation. These arguments fail. The Declarants were both recipients of MS-Grand checks signed by Vitogiannis in partial payment of their invoices. Paying over trust assets is evidence of control of trust assets. Declarants have personal knowledge of their receipt of the checks, and can assert personal knowledge based on inferences customarily drawn by business executives. Accordingly, I deny Vitogiannis' motion to strike Declarants' statements as to his position of control over trust assets.

Finally, Vitogiannis moves to strike statements as to the amounts owed to them by MS-Grand. It follows, however, that because the Declarants have personal knowledge of Vitogiannis' position of responsibility as well as the debts owed to them by MS-Grand, they also have sufficient knowledge to conclude that Vitogiannis is liable to them for the amounts due to them.

For the foregoing reasons, Vitogiannis' motion to strike is denied.

**III. STATEMENT OF RELEVANT FACTS**

The facts of this case are largely undisputed. Tuchten, Auster, Navilio, and Marano are Illinois corporations that sell wholesale quantities of perishable agricultural commodities

("produce").  MS-Grand is an Illinois corporation that operated a grocery store doing business as Melrose Fresh Market.  At all relevant times, Limperis was an officer, director and signatory on all bank accounts of MS-Grand who was always in a position of control over the PACA trust assets belonging to the Marano and the Tuchten Plaintiffs and actively involved in the operation and management of MS-Grand.

Vitogiannis was a 33% shareholder of MS-Grand, an employee of MS-Grand, and a signatory of both the payroll and operating bank accounts of MS-Grand.  He was employed as a night manager at Melrose Fresh Market from approximately December 5, 2007 though July 31, 2008, and served as Vice President prior to April 2, 2008.  Additionally, Vitogiannis attended corporate meetings.  He also signed a guaranty regarding an MS-Grand meat vendor on March 27, 2008.  Vitogiannis was fired as an employee of MS-Grand on the morning of July 31, 2008, and did not receive wages for the last six weeks of his employment.  On August 7, 2008, Vitogiannis wrote to Standard Bank and requested to be notified immediately if any overdrafts or returned checks occurred regarding the MS-Grand accounts, but did not ask to be removed as a signatory from the accounts.  Vitogiannis did not sign or place any purchase agreements with the Intervening Plaintiffs, nor did he accept or sign for any produce supplied by them.  Numerous MS-Grand payroll checks are dated August 4, 2008, though they were signed in July.  After July 30, 2008, Vitogiannis did not sign any checks regarding MS-Grand.  Vitogiannis and Limperis paid various non-trust creditors, including $150,000 in rent dated July 28, 2008.

Tuchten, Auster, Navilio, and Marano were licensed under the PACA at all relevant times regarding this lawsuit, and sold and delivered wholesale lots of produce.  Tuchten, Auster,

Navilio, and Marano preserved their interests under the trust provisions of PACA by sending invoices to MS-Grand which contained the language required by 7 U.S.C. Section 499e(c)(4).

Between April 16, 2008 and July 23, 2008 Marano sold and delivered to MS-Grand and its principals lots of produce worth $959,227.68. Defendants accepted this produce. Marano has not been paid for this produce and is owed $959,227.68 plus interest of $287,768.30, calculated at 18% per month through March 23, 2010. Marano also asks for attorneys' fees. Tuchten, Auster and Navilio also delivered produce to Defendants for which they have not been compensated. Tuchten is owed a principal amount of $28,414.50 plus contract interest at the rate of 18% through April 20, 2010 in the amount of $8,619.52 from MS-Grand. As to Vitogiannis, Tuchten seeks $28,414.50 in principal and $9,778.36 in interest. Auster seeks $125,484.00 in principal against MS-Grand and Limperis and $41,093.68 in interest.

As to Vitogiannis, Auster seeks $88,678.00 in principal and $32,760.00 in interest. Navilio seeks $20,014.85 in principal and interest in the amount of $5,232.55 as to MS-Grand and Limperis. Pursuant to the terms of their invoices, Tuchten, Auster, and Navilio are entitled to reasonable attorneys' fees.

Approximately 30-40% of the perishable produce delivered to MS-Grand during the relevant period spoiled and was discarded before it could be sold. The produce that MS-Grand was able to market was sold at a markup of between 30-40%. MS-Grand was not a profitable business and reported a loss of approximately $2,900,000.00 for the period of time it was open in 2008.

On September 19, 2008, this Court entered a Preliminary Injunction ordering MS-Grand not to alienate, dissipate, pay over, or assign any assets of MS-Grand Bridgeview, Inc. On

November 13, 2008 an Agreed Order Modifying Preliminary Injunction Order was entered which allowed Defendants to retain funds from MS-Grand's payroll account to cover non-owner wages due to MS-Grand Employees.  The balance was to be turned over to Tuchten's counsel to be held in trust for the benefit of all MS-Grand PACA trust creditors, as determined by this Court.  On July 1, 2009 a contempt order was entered against Plaintiff and Marano was ordered to disgorge $16,500.00 in trust funds wrongfully received by Marano from MS-Grand.  The $16,500.00 was turned over to William B. Kohn, Esq. to be held in trust for the benefit of all MS-Grand PACA trust creditors.  A total of $27,202.20 is currently being held in trust.

## IV. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The facts presented are to be construed in a light most favorable to the nonmoving party.  *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir.2001). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact."  *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

**V. DISCUSSION**

A. The Perishable Agricultural Commodities Act ("PACA")

The PACA was enacted to "suppress unfair and fraudulent practices in the marketing of fruits and vegetables in interstate and foreign commerce." 49 Fed. Reg. 45737. Accordingly, the PACA requires produce dealers to make "full payment promptly" for any produce they purchase. 7 U.S.C. § 499(b)(4). Section 499e(c) imposes a statutory trust on all produce-related assets, including the produce itself, other products derived therefrom, and any receivables or proceeds from the sale thereof, held by agricultural merchants, dealers and brokers which must be maintained for the benefit of all unpaid suppliers and sellers of the produce until full payment has been made. 7 U.S.C. § 499(e)(c)(2). The trust arises upon the commencement of the produce purchaser's business and receipt of perishable agricultural commodities, and is continually in existence throughout the life of the purchaser's business.

The trust is a non-segregated "floating" trust that applies to all of the buyer's produce inventory when the produce is received, as well as to any subsequent proceeds from the sale of produce. 7 U.S.C. § 499e(c)(2). The PACA requires produce suppliers to provide notice to the buyer of their intent to preserve trust benefits. Notice can be accomplished by including the following language on the face of licensed produce supplier's invoices: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 USC §499e(c))."

Failure to maintain the trust and make full payment promptly to the beneficiary trust is unlawful. 7 U.S.C. § 499(b)(4). Agricultural merchants and dealers "are required to maintain

trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 CFR § 46.46(e)(1).

To sustain their burden against MS-Grand, Limperis and Vitogiannis, Plaintiffs must establish that Defendants (1) were in a position to oversee the proper application of the trust assets, and (2) breached their fiduciary duty to PACA creditors by dissipating trust assets. *Coosemans Specialities, Inc. v. Gargiulo*, 485 F.3d 701 (2d Cir. 2007).

### B. Marano Preserved Its Interest In The PACA Trust.

To sustain a claim under the PACA, a plaintiff must establish that (1) it qualifies for protection under PACA as a produce supplier, (2) it provided the requisite notice of intent to preserve its interest in the statutory trust, and (3) the defendant acted inconsistent with its duty to maintain the trust and ensure any assets held in trust were freely available to fulfill any outstanding obligations to trust beneficiaries. 7 U.S.C. § 499 *et seq*. Defendants MS-Grand and Limperis argue that there is a genuine issue of material fact as to whether Marano failed to preserve its trust interest.[2] I disagree.

Anton Marano submitted to this court a declaration stating that:

> Marano preserved its interest in the unpaid principal amount of $959,277.68 by timely delivering statements to MS-Grand and its principals which include [sic] the language required by 7 U.S.C. § 499e(c)(4).

Defendants argue that because Marano failed to produce the statements it allegedly provided to Defendants, it has not preserved its trust interest. In support, Marano provided a summary statement itemizing the outstanding debts owed by MS-Grand. This summary of invoices contains the required language, and was sent to MS-Grand nearly three months after the first

---

[2] Defendants do not dispute that the Tuchten Plaintiffs preserved their interest under the PACA.

delivery of PACA produce.  Defendants contend that this evidence is insufficient to establish that the individual invoices sent to MS-Grand included the requisite language.

The declaration of Peter Limperis states that he was unable to locate the individual invoices referenced in Anton Marano's affidavit.  Peter Limperis's declaration, however, does not deny receiving the invoices, nor does it deny that the invoices contained the language necessary to preserve Marano's trust interest.[3]  Local Rule 56.1(b)(3)(c) states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."  Because Defendants have failed to contradict the declaration of Marano I find that Marano preserved its interest in the PACA trust by timely delivering statements to MS-Grand and its principals which included the language required by 7 U.S.C. § 499e(c)(4).

C. Liability Under the PACA

To maintain a claim under the PACA against a defendant, the plaintiffs must establish that: (1) they qualify for protection under PACA as produce suppliers; (2) they provided the requisite notice of intent to preserve their interest in the statutory trust to the defendant; and (3) the defendant acted inconsistent with its duty to maintain the trust and ensure any assets held in trust were freely available to fulfill any outstanding obligations to trust beneficiaries.  7 U.S.C. § 499.  Plaintiffs have shown both that they qualify for protection under PACA and that they provided the requisite notice of intent to preserve its interest in the statutory trust.  The

---

[3] I note that the affidavit submitted to the court is incomplete in that certain text on the right side of the affidavit appears to be cut off.  Therefore, the statement of Peter Limperis reads: "These records alleged to have been sent by Anthony Marano Company were [not] located, although invoices of many other produce suppliers were found."  Given the representations of counsel, I accept that the word "not" was inadvertently omitted from the affidavit submitted to the court.

remaining question is whether Defendant MS Grand acted inconsistent with its duty to maintain the trust. I find that it did.

Failure to maintain the trust and make full prompt payment is unlawful under the statute. 7 U.S.C. § 499b(4). Agricultural merchants and dealers "are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 CFR 46.46(d)(1). "Any act or omission inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of section 2 of the Act. 7 U.S.C. § 499(b). Dissipation is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 CFR 46.46(a)(2). The PACA trust arises upon the debtor's acceptance of the perishable goods from the seller and consists of a buyer's produce-related assets which are held for produce suppliers in the case of a business failure. PACA trust rights take priority over the interests of all other creditors." *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1315 (11th Cir. 1992). A trust beneficiary can initiate an action in federal court "to enforce payment from the trust." 7 U.S.C. § 499e(c)(5)(i).

Defendants MS-Grand and Limperis put forth two arguments to defeat Plaintiffs' motions for summary judgment. First, Defendants argue that Plaintiffs have failed to provide any evidence to establish that either MS-Grand or Peter Limperis acted inconsistent with their duty to maintain PACA trust assets and make them freely available to PACA creditors. Next, Defendants argue that MS-Grand was not a profitable store. Defendants argue that the mere existence of outstanding debts relating to PACA produce does not establish the unlawful dissipation of trust assets. Both of Defendants' arguments are unavailing.

## 1. PACA Trust Assets Were Unlawfully Dissipated.

Defendants first argue that no evidence has been put forth to establish that either MS-Grand or Limperis acted inconsistent with their duty to maintain PACA trust assets. Specifically, Defendants contend that the existence of outstanding debts for produce delivered is insufficient to establish a prima facie showing of unlawful trust asset dissipation.

Defendants MS-Grand and Limperis rely heavily on *Strube Celery & Vegetable Co. v. Zois (In re Zois)*, 201 B.R. 501 (Bankr. N.D. Ill 1996). In *Zois*, a wholesaler brought adversary proceedings against individual Chapter 7 debtors seeking the determination that the wholesaler held nondischargeable claims against each debtor for unpaid produce pursuant to 11 U.S.C. § 523(a)(4). This statute provides that there shall be no discharge from any debt "for fraud or defalcation" while acting as a fiduciary. The plaintiff argued that the debtors received agricultural commodities and failed to maintain a trust as required by the PACA. *Id*. at 508.

In *Zois*, the court acknowledged that a PACA trust only consists of a "buyer's produce-related assets which are held for produce suppliers in the case of a business failure. [] The trust is both on the perishable goods and on the receivables and sale proceeds thereof." *Id*. at 509. However, to the extent that the trust is on perishable goods, "the trust res disappears as the perishable goods perish. '[O]nce the res of a trust disappears, the obligation to pay becomes merely a personal debt, although certain fiduciary duties may remain.'" *Id*. (Internal citations omitted). There, the debtors had plead facts suggesting that some of the perishable commodities were spoiled and unmarketable. *Id*. Accordingly, the Bankruptcy court held that to the extent that items remained unsold, they remained within the PACA trust. However, to the extent that the items rotted away unsold, "then the trust res disappeared, leaving the obligations to pay for those unsold goods as a personal debt outside of the PACA Trust provisions." *Id*. Accordingly,

the court found that to the extent that the debtors' failure to pay plaintiff was due to an inability to market any perishable goods, they did not breach their PACA Trust obligations. *Id.* Instead, the debtors only breached their PACA Trust obligations to the extent that the debtors did market the perishable items, and then failed to remit payment to the plaintiff. *Id.*

In *Zois*, it was not established that the defendant sold or was paid for all the produce purchased from the plaintiff. Like the defendants in *Zois*, MS-Grand and Peter Limperis claim that "approximately 30-40% of the perishable produce delivered to MS-Grand during the relevant period spoiled and were discarded before it could be sold." However, it is undisputed that Defendants sold between 60% and 70% of their produce at a markup of between 30% and 40%. Neither party offers facts to show which producer provided the items that spoiled, nor does either party suggest what income was derived from the sales of 60-70% of the unspoiled produce. Regardless, the proceeds of such sales should have been kept in trust because the PACA trust is "both on the perishable goods and on the receivables and sale proceeds thereof." *Zois*, 201 B.R. at 509. Defendants had a duty to hold the produce received from Plaintiffs, and accounts receivable or any proceeds derived from their sale in trust. The PACA trust beneficiaries are entitled to full payment of the contract price for the sale of produce. 7 U.S.C. § 499e(c)(2). The value of the trust cannot be diminished simply because certain produce might have spoiled on the shelves of MS-Grand. Despite this duty, bank records show that MS-Grand paid its payroll, rent, and non-produce creditors. The federal regulations define "dissipation" of trust assets as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid [sellers] to recover money owed in connection with produce transactions." 7 CFR 46.46 (a)(2); *see Reds Market v. Cape Canaveral Cruise Line, Inc.*, 181 F.Supp.2d 1339, 1344 (M.D. Fla. 2002) (payment of ordinary business expenses constitutes a

violation of fiduciary duties to unpaid PACA trust beneficiaries).  Accordingly, there is no genuine dispute that unlawful dissipation of trust assets occurred.

Next, Defendants argue that because MS-Grand was not a profitable business, it simply did not have adequate funds to pay all of its PACA creditors. Therefore, just because MS-Grand was unable to satisfy its obligations, it did not necessarily unlawfully dissipate PACA trust assets.  Instead, Defendants contend that it was "a financial impossibility" rather than unlawful dissipation that left MS-Grand unable to satisfy its PACA creditors.  Again, Defendants are mistaken.  As discussed *supra*, Defendants violated their PACA duties not simply by failing to pay its invoices, but by unlawfully dissipating the PACA trust funds.  Accordingly, Plaintiffs are entitled to full payment of the contract price for the sale of produce under PACA regardless of Defendants' profitability.  "Unlike most common law trusts, a PACA trust entitles the trust beneficiary to a sum certain."  *C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 486 (2d Cir. 2001).

D. Individual Liability For PACA Violations.

An individual who is in a position to oversee the proper application of  PACA trust assets, and who does not preserve the trust assets for the beneficiaries, has breached a fiduciary duty and is personally liable for that act.  *Patterson Frozen Foods v. Crown Foods Int'l*, 307 F.3d 666, 669 (7th Cir. 2002).  To determine personal liability, a court must determine: (1) whether an individual's involvement with the company was sufficient to establish a legal responsibility; and (2) whether the individual breached a fiduciary duty to the PACA creditors.  *Larry Shepard v. KB Fruit & Vegetable, Inc.*, 868 F.Supp. 703, 705-06 (E.D. Pa. 1994).   Individuals need to be actively involved in the operations of the business to establish legal responsibility.  *Id*. at 706.

## 1. Peter Limperis Is Personally Liable.

There is no dispute that Defendant Limperis was actively involved in the operations and management of MS-Grand as an officer and director of the corporation, and that he was in a position to control the PACA trust assets belonging to the produce trust creditors of MS-Grand. Additionally, there is no dispute that Limperis was a signatory on MS-Grand's bank accounts at all relevant times. Limperis was in a position of control over the PACA trust assets and was responsible for ensuring that the PACA trust assets were not dissipated. Limperis' failed to preserve the trust assets when he issued payroll checks, and checks to other creditors. This was a breach of his fiduciary duty for which he is personally liable. *Patterson Frozen Foods*, 307 F.3d at 669.

## 2. Steven Vitogiannis Is Personally Liable.

As an initial matter, Intervening Plaintiff Navilio has withdrawn its opposition to Vitogiannis' cross-motion for summary judgment. Vitogiannis' statement of facts establishes that he was not involved with MS-Grand in any capacity after July 30, 2008. Because Navilio's delivery of produce only began on July 31, 2008, Navilio has acknowledges that it has no basis to pursue a claim against Vitogiannis. Accordingly, Navilio's motion for summary judgment as to Vitogiannis is denied, and Vitogiannis' motion for summary judgment as to Navilio is granted. Intervening Plaintiffs Tuchten and Auster have conceded that Vitogiannis cannot be liable for produce sold after July 30, 2008, when his employment as "Manager" was terminated. Accordingly, because Tuchten alleges that it sold produce to MS-Grand between June 1, 2008 and June 28, 2008, and Auster alleges that it sold produce to MS-Grand between June 16, 2008 and August 27, 2008, the relevant time frame for this motion is June 1, 2008 to July 30, 2008.

Vitogiannis disputes any basis for establishing his personal liability for the debts owed to

Tuchten and Auster. In determining personal liability, I must first establish whether Vitogiannis'

involvement with MS-Grand was sufficient to establish legal responsibility. When determining

an individual's involvement in the corporation, courts have looked to various factors such as

whether an individual was a director (*Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 706

(2nd Cir. 2007), had a role in causing the seller to commit a breach of trust (*Shepard v. K.B.*

*Fruit & Vegetable*, 868 F. Supp. 703, 706 (E.D. Pa. 1994)), had control of the day-to-day

operations (*Okun, Inc. v. Zimmerman*, 814 F. Supp. 346, 449-50 (S.D.N.Y. 1993)), was active in

the management of the company (*Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir.

1997)), signed for company accounts (*K.B. Fruit & Vegetable*, 868 F. Supp. at 706), or was the

primary actor in failing to pay under PACA (*Bronia Inc. et al. v. Ho*, 873 F.Supp. 854, 861

(S.D.N.Y. 1995)).

Tuchten and Auster argue that Vitogiannis was in a position to control the PACA trust

because he was a one-third owner of MS-Grand who attended shareholder meetings, served as

Vice President of MS-Grand until at least April 2, 2008, was an authorized and active signatory

on both the payroll and operating accounts at Standard Bank for MS-Grand from November,

2007 until the accounts were closed in August, 2008, and in fact issued MG-Grand payroll

checks until July 28, 2008, executed a personal guaranty to pay MS-Grand's debt with MS-Grand

creditor, Chiappeti Wholesale Meat Company on March 27, 2008, and was a paid employee

working as a "Night Manager" in exchange for compensation.

Vitogiannis attempts to evade personal liability by pointing to facts which he asserts

necessitate a finding of no liability. For example, Vitogiannis did not found MS-Grand or submit

its federal tax information, nor did he purchase produce for MS-Grand. He also contends that the

overall management and control of the financial and corporate affairs were the responsibility of

Limperis and that Vitogiannis was not authorized to unilaterally issue or sign non-payroll checks for MS-Grand. Furthermore, Vitogiannis did not have any authority to manage or control the financial affairs of MS-Grand, and was merely a night manager, attending shareholder meetings.

More than one person can be in a position to control and affect the trust assets. *Shepard*, 868 F.Supp. at 706. Accordingly, my finding Peter Limperis liable to Plaintiffs does not preclude a finding of liability as to Vitogiannis. The fact that Vitogiannis was an MS-Grand shareholder cannot alone establish that he was in a position of control to affect the PACA trust assets.

Certain relevant facts argued in this motion require clarification. First, there is a question of fact as to Vitogiannis' role as Vice President of MS-Grand during the relevant period of June 1, 2008 to July 30, 2008. It is uncontested that Vitogiannis served as Vice President of MS-Grand until April 2, 2008. There is no evidence of Vitogiannis' resignation as Vice President prior to the termination of his employment on July 31, 2008, and Intervening Plaintiffs have presented evidence that Vitogiannis held himself out as Vice President when he applied for credit on behalf of MS-Grand on April 12, 2008. However, Vitogiannis denies signing the Credit Applications and states that the signature on the Credit Application is a forgery. Even accepting that Vitogiannis was not the Vice President of MS-Grand during the relevant time period, he was still a shareholder, who attended shareholder meetings and participated in the day-to-day functions of the business as a night manager.

Next, the parties quibble over Vitogiannis' authority as a signatory on MS-Grand's bank accounts. Vitogiannis admits he was an authorized and active signatory on both the payroll and operating accounts at Standard Bank for MS-Grand from November 2007 until August 2008. However, Vitogiannis states that he was not authorized to unilaterally issue or sign non-payroll

checks from MS-Grand. He was though, authorized to, and did, unilaterally issue and sign MS-Grand payroll checks until July 28, 2008. Though Vitogiannis did sign creditor checks, such as checks for rent, during the relevant period, Vitogiannis claims that he was not authorized to unilaterally issue such payment, and that Limperis decided which creditors of MS-Grand to pay.

It is undisputed that Vitogiannis is a one-third shareholder of MS-Grand, that he attended shareholder meetings, served as night manager during the relevant period, and was authorized to, and did, unilaterally issue and sign MS-Grand payroll checks. Additionally, Vitogiannis was an authorized signatory on MS-Grand's operating account from which creditor bills were paid, and whereby he alone signed certain creditor checks. A question of fact remains as to whether Vitogiannis served as Vice President of MS-Grand during the relevant period, though it is undisputed that he was not a Director of MS-Grand. His involvement in the management of the day to day company dealings was limited, as when he served as a night manager, he was not involved in any purchasing, higher level management or financial oversight. Instead, his duties were limited to communicating with department heads, assisting customers, obtaining coin change from the bank, and removing cash from register drawers at the end of the night.[4] Vitogiannis, however, did attend shareholder meetings. Though it is true that Vitogiannis issued payroll checks, it was not established that he was able to pay other creditors without authorization from Limperis. Additionally, Vitogiannis did not review MS-Grand bank statements or observe the balance on MS-Grand accounts.

---

[4] Vitogiannis collected cash register drawers and placed them in a safe at Melrose Fresh Market. Another MS-Grand employee, Patricia Georgellos, collected the sales proceeds and other cash and checks from MS-Grand's cash register drawers and deposited the same at Standard Bank.

Based on the undisputed facts before me, I find that Vitogiannis was in a position to control the trust assets. Vitogiannis served as night manager of Melrose Fresh Market, and oversaw not only the produce, but also other trust assets. Though Vitogiannis might not have reviewed MS-Grand bank statements, or observed the balances on MS-Grand's accounts, the undisputed fact remains that Vitogiannis was a signatory to the MS-Grand accounts, and signed payroll checks. Vitogiannis disputes the assertion that he had authority to manage or control the financial affairs of MS-Grand, and states that he wished to be removed as a signatory on MS-Grand's accounts, but was not aware that he could do so without other shareholders' consent. Vitogiannis, however, fails to show any effort made to obtain such consent, or remove himself as signatory to the accounts. Moreover, Vitogiannis was a one-third owner of MS-Grand, and attended shareholders' meetings.

Having established personal liability, I now must determine whether Vitogiannis breached a fiduciary duty to the PACA creditors. *Larry Shepard v. KB Fruit & Vegetable, Inc.*, 868 F.Supp. 703, 705-06 (E.D. Pa. 1994). He did. Like Limperis, Vitogiannis breached his fiduciary duty when his dissipated trust funds by paying other creditors. Accordingly, Vitogiannis' motion for summary judgment as to Tuchten and Auster is denied. Tuchten and Auster's motion for summary judgment is granted.

## VI. CONCLUSION

For the foregoing reasons, Marano, Tuchten, and Auster's summary judgment motions are granted. Navilio's motion for summary judgment as to MS-Grand and Limperis is granted, but denied as to Vitogiannis. Vitogiannis' motion for summary judgment is denied as to Tuchten and Auster, and granted as to Navilio. Vitogiannis' motion to strike is denied. Plaintiff and Intervening Plaintiffs are granted 21 days to submit an attorney fee application to the court.

ENTER:

James B. Zagel
United States District Judge

DATE:  December 23, 2010